UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE CHARBONEAU,

　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　　File No.  5:04-CV-116

v.

　　　　　　　　　　　　　　　　　　　　　HON. ROBERT HOLMES BELL

SEVERN TRENT LABORATORIES, INC.,

　　　　　Defendant.

_____/

## O P I N I O N

　　　　This civil rights retaliation action is before the Court on Defendant's motion for summary judgment.  For the reasons that follow Defendant's motion will be granted.

### I.

　　　　Plaintiff Diane Charboneau (f/k/a Diane Bevaqua, hereinafter "Charboneau") has been employed in the environmental testing industry since 1978.  In 1998 Charboneau was employed as a regional sales manager for American Environmental Network, Inc. ("AEN"), when it was acquired by Defendant Severn Trent Laboratories ("STL"), an environmental testing company.  When STL acquired AEN, Charboneau became a regional sales manager for STL.

　　　　From 1999 on, Charboneau's supervisor at STL was Jim Miller, the Vice-President of Sales and Marketing.  In August 1999 Miller appointed Charboneau to lead the National Accounts Program.  (Miller Decl. ¶ 2).  In March 2000 Miller assigned Charboneau to the

newly created national sales and marketing team and gave Charboneau the title of national accounts manager.  (Miller Decl. ¶ 5).

In June 2000 a new position of Business Development Directors ("BDD") was developed and five males were appointed to these positions.  (Miller Decl. ¶¶ 6-7, Ex. 1). BDDs and their teams of account executives were assigned to focus on sales for particular STL laboratories.  (Miller Decl. ¶ 6).  Miller did not consider Charboneau for a position as a BDD because Miller thought that based on her experience Charboneau was best suited for a national sales role.  (Miller Decl. ¶ 8).

In August 2000 Miller increased Charboneau's salary by $5,000.  According to Miller, Charboneau was given the raise in response to her complaint that Diane Kenny had recently been hired at the same base salary that Charboneau was making at that time.  (Miller Decl. ¶ 10).  Charboneau agrees that she had a conversation with Miller about the salary of a new hire, but she contends that the raise was given in response to her repeated complaints that women were receiving unequal pay as compared to males.  Specifically, she noted that Don Goebel, who had the same job title as Charboneau, had a base salary of $95,000 as compared to Charboneau's base salary of $75,000.  (Charboneau Dep. at 96-101).

In December 2000, Miller received a complaint from Chevron Corporation, requesting that Plaintiff be removed from the STL sales team that was calling on Chevron because she did not listen.  (Miller Decl. ¶¶ 12-13).

2

In February 2001 Miller asked Charboneau to be the corporate representative on the Roy F. Weston account and to supervise and act as BDD for Jane Huber on that account. (Charboneau Dep. at 116).  Charboneau was invited to a BDD meeting sometime between February and August 2001, but then Miller advised her that the meeting was for the other BDDs and that she was not needed at the meeting.  (Charboneau Dep. at 122-24).

In August 2001, Miller concluded that Charboneau was struggling in her role as national accounts manager.  Miller pared down the focus of Charboneau's responsibilities to a specific list of fifteen large national accounts, the Select National Account Priority List ("SNAPL").  (Miller Decl. ¶ 17; Charboneau Dep. at 125-26).

In December 2001, STL laid off five employees during a reduction in force due to low productivity.  Prior to their lay-off, none of these five employees had claimed any form of employment discrimination.  (Miller Decl. ¶¶ 20-21; Ploof Decl. ¶ 7).

Prior to January 2002 Charboneau spoke with Senior Vice President and Chief Operating Officer Keith Wheatstone and Human Resources Director Nancy Ploof about obstacles she met in connection with the national account program.  (Charboneau Dep. at 148).  She explained that "[t]he support was not there; and that I was at my wit's end in trying to understand where and what the issues were . . . . I felt that there were some, you know, communication problems, you know; can she give me – or I wanted some suggestions, what do I do?  I've tried to talk to Jim.  I don't know what the issues were."  (Charboneau Dep. at 148).  "And I was totally qualified and I was just really frustrated with the national account

program and the lack of support surrounding it." (Charboneau Dep. at 149). Wheatstone and Ploof suggested she sit down and have a face-to-face meeting with Miller. (Charboneau Dep. at 149). In January 2002, Charboneau sat down with Miller after a day of successful meetings in Delaware. (Charboneau Dep. at 145-47, 150). Charboneau told Miller she had not had a review from him, that she felt that there were some communications issues and that she wanted him to tell her how her performance was. (Charboneau Dep. at 151). Miller told her she was doing a great job, that she did not need to change anything, but that he would like her to reinstitute her weekly sales activity reports. (Charboneau Dep. at 153).

In January 2002 Charboneau received a job description from Human Resources changing her position from national accounts manager to director of national accounts. (Charboneau Dep. at 140; Ploof Decl. ¶ 10).

In February 2002, Charboneau prepared a draft of Huber's performance evaluation and submitted it to Miller for review. (Charboneau Dep. at 158). Miller disagreed with Charboneau's assessment of Huber and suggested changes in the review. (Charboneau Dep. at 162). Charboneau disagreed with Miller's suggestions and discussed her concerns with Ploof and Wheatstone. (Charboneau Dep. at 162-63).

In early 2002 Miller told Charboneau that he was dissatisfied with the growth of the SNAPL accounts. (Charboneau Dep. at 173). Charboneau prepared a matrix showing that there had been growth in the SNAPL accounts. (Charboneau Dep. at 173).

4

In May 2002, Miller sent out a memo advising of sales reorganization changes, including refocusing Charboneau's efforts to a target account list ("TAL") of large corporate accounts. (Charboneau Dep. at 175; Miller Decl. ¶ 23). Miller changed Charboneau's responsibilities based on his conclusion that Charboneau was not increasing overall sales to the SNAPL accounts. (Miller Decl. ¶ 23). Miller, together with the senior management team,[1] also decided to change the structure of Charboneau's compensation package. Charboneau's base salary was reduced but the threshold for her commissions was set at zero instead of the customary $3 million. (Miller Decl. ¶ 22-25). The base salary adjustment went into effect in October 2002. (Miller Decl. ¶ 30).

Charboneau was not happy with the changes. In May she told either Ploof, Wheatstone or Collins Villemaire that she was retaining legal counsel and going to the Michigan Department of Civil Rights. (Charboneau Dep. at 175-76). She had several telephone conversations with Ploof about how her accounts were being taken away and her salary was going to be changed. (Charboneau Dep. at 176). Over Memorial Day weekend she told Ploof that she did not think it was anything other than discrimination. (Charboneau Dep. at 184).

_____

[1]The STL senior management team consisted of President and Chief Executive Officer Rachel Brydon Jannetta, Senior Vice President and Chief Operating Officer Keith Wheatstone, Vice President of Client and Operations Services Charlie Carter, Chief Financial Officer and Senior Vice President Heather Collins Villemaire, and Vice-President of Sales and Marketing Jim Miller. (Collins Villemaire Decl. ¶ 6).

On July 12, 2002, Miller gave Plaintiff a less-than-standard overall rating on her annual performance review and placed her on probationary status for 180 days because the audited sales data reflected an overall decrease in sales to SNAPL accounts from July 2001 through June 2002.  (Miller Decl. 28-29).

Charboneau objected to the less than standard rating.  On July 14, 2002, she sent a performance evaluation rebuttal memo to Miller and copied it to the senior management team "because I didn't feel supported and I felt that the issue was a backlash of the positions that I took with Jim [Miller]."  (Charboneau Dep. at 199).   In her memo Charboneau accused Miller of repeatedly changing her job description, a lack of consistency, not giving her notice of inadequacies, and not supporting her efforts.  She did not accuse him of gender discrimination.  She advised that she was "currently contemplating the direction of legal counsel."  (Pl Ex. 14).

A telephone conference was held on July 19, 2002, between Charboneau, Miller, and Ploof, to discuss the performance review.  Charboneau advised that contrary to Miller's figures, she had achieved a 15% growth in sales on SNAPL accounts.  (Ploof Decl. ¶¶ 12-13).

In a follow-up telephone conversation that same day, Charboneau told Ploof that she felt Miller treated men in the sales organization more favorably than women.  Ploof had heard Charboneau's concerns about her working relationship with Miller since December 2001, but this was the first time Ploof understood that Charboneau was claiming there was

gender discrimination in the sales and marketing group. (Ploof Decl. ¶ 14). In December 2001, 21 of the 55 sales personnel reporting to Miller were female. (Ploof Decl. at 4). Ploof discussed Charboneau's gender discrimination claim with Collins Villemaire. Because Collins Villemaire had never observed any indication that Miller discriminated against women and because Miller had several successful women under his supervision, she did not believe there was any merit to Charboneau's discrimination claim. (Collins Villemaire Decl. ¶ 3). Based upon Collins Villemaire's statements and the lack of any other discrimination complaints, Ploof also concluded that there was no merit to Charboneau's discrimination claim. (Ploof Decl. ¶ 15).

Ploof received a copy of Charboneau's own sales revenue matrix, but believed it would be extremely difficult, if not impossible, to verify Charboneau's manually prepared numbers. (Ploof Decl. ¶ 17). Ploof reviewed the audited corporate revenue data that Miller had relied on. Ploof concluded that Miller's determination that SNAPL sales had not grown was supported and that Charboneau's contention that they had increased by 15% was not. (Ploof Decl. ¶ 17).

On July 26, 2002, a telephone conference was held between Miller, Charboneau, Ploof, and Collins Villemaire. During this conversation Collins Villemaire explained that the new compensation plan was favorable because Charboneau would receive commissions on all sales. She also explained that the revenue numbers Miller relied on were the official, audited sales figures of STL, which is an accurate measure of revenue generation. (Collins

Villemaire Decl. ¶ 4). During this telephone conference Miller informed Charboneau that the job description posted in January was in error and that Charboneau's job had not changed from national accounts manager to director of national accounts. (Charboneau Dep. at 142-43; Ploof Decl. at 10).

On July 29, 2002, Charboneau emailed Ploof the following: "Based on our telephone conversation of earlier today please proceed to the investigating the issues that I mentioned today and during our other telephone conversation during the last few months." (Pl. Ex. 11).

Plaintiff filed her first discrimination charge with the Michigan Department of Civil Rights ("MDCR") on August 23, 2002, alleging that she was denied equal pay and was subjected to unfair conditions because of her sex. She also alleged that she received a less than standard evaluation as a result of her complaint of sex discrimination.

On May 12, 2003, Plaintiff filed a second charge of discrimination with the MDCR, alleging that she was denied reinstatement into the director of national accounts position due to her sex.[2]

In the year ending June 2003, sales to the accounts on Charboneau's TAL had decreased over the previous year. Plaintiff's total revenue generated on her assigned TAL was $791,000 as compared to $1,025,000 during the previous 12 month period. (Miller Decl. ¶ 42). On June 16, 2003, the senior management team decided to place Charboneau on a

---

[2]Plaintiff filed a third discrimination charge with the MDCR on October 6, 2003. This third filing is not relevant to Plaintiff's retaliation charge because it was filed after she was terminated.

8

Performance Improvement Plan ("PIP").  (Collins Villemaire Decl. ¶ 6).  Charboneau was given 90 days to increase her revenue by $350,000.  At the conclusion of the three month period Ploof advised the senior management team that Charboneau missed the $350,0000 goal by $168,000.  (Ploof Decl. ¶ 24).  Plaintiff was terminated on September 17, 2003, for substandard sales performance.  (Miller Decl. ¶ 45).

## II.

Plaintiff filed this action in federal court pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., The Equal Pay Act, 29 U.S.C. § 206(d), *et seq*. and the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2201 et seq. (Compl. ¶ 1).  Plaintiff has voluntarily dismissed her Equal Pay Act claim and her sex discrimination (failure to promote) claim.  (Pl. Br. in Opp. at 2).  Accordingly, the only remaining claim is the retaliation claim.

At oral argument Plaintiff alleged that her retaliation claim was brought pursuant to the Elliott-Larsen Act rather than Title VII.  That is not what was alleged in Plaintiff's complaint.  Plaintiff alleged in her complaint that Defendant's conduct in retaliating against her violated Title VII, the Equal Pay Act, and Michigan's Elliott-Larsen Civil Rights Act. (Compl. ¶ 78).  The Court is doubtful that Plaintiff intended to suggest that she was voluntarily dismissing the Title VII claim.  Subject matter jurisdiction in this case is premised

on the existence of a federal question.[3]  Because dismissal of the federal retaliation claim would deprive this Court of subject matter jurisdiction, the Court assumes that, consistent with the allegations in the complaint, Plaintiff has alleged retaliation in violation of both federal and state law.

### III.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

"On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion."  *Hanover Ins. Co. v.*

---

[3]Plaintiff's complaint invokes this Court's jurisdiction based upon the existence of a federal question.  (Compl. ¶ 1).  Plaintiff alleged that she is a resident of the state of Michigan (Compl. ¶ 2) and that Defendant is a Delaware corporation registered to transact business in the State of Michigan.  (Compl. ¶ 3).  However, Plaintiff did not allege jurisdiction under diversity of citizenship and she did not allege the necessary amount in controversy.

*American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (citing *Matsushita*, 475 U.S. at 586-88). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## IV.

Charboneau claims she was dismissed in retaliation for raising complaints of gender and pay discrimination. Plaintiff contends that all the feedback she received on the job had been positive until she began reporting gender and pay discrimination in 2000. Plaintiff contends that when she began complaining of discrimination, Miller began retaliating against her. She contends she was never given a written performance evaluation until July 17, 2002, and that she was never given a sales goal until she was placed on a PIP on June 16, 2003. Both of these occurred only after she began complaining about discrimination. Charboneau contends that Miller's retaliatory activities escalated when she filed her complaints with the MDCR.

A plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a prima facie case under the *McDonnell Douglas* framework. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Charboneau has

presented no direct evidence of retaliation. Accordingly, she is required to establish a prima facie case of unlawful retaliation in order for her Title VII action to lie. *Id.*

> To establish a prima facie case of retaliation, a plaintiff must show:
>
> (1) that she engaged in protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and adverse employment action.

*Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005) (citing *Fenton v. HiSAN*, 174 F.3d 827, 831 (6th Cir. 1999)). The same elements are required to establish a prima facie case of unlawful retaliation under the Elliott-Larsen Civil Rights Act. *DeFlaviis v. Lord & Taylor*, 223 Mich. App. 432, 436, 566 N.W.2d 661, 663 (1997). "If a plaintiff establishes a prima facie case of retaliation, the defendant may rebut the presumption of retaliation by asserting a legitimate, non-discriminatory reason for its actions." *Balmer*, 423 F.3d at 614 (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000)). "The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for the employment action is pretextual." *Id.* (citing *Morris*, 201 F.3d at 793).

"The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *DiCarlo*, 358 F.3d at 420 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

The first element of the prima facie case requires Charboneau to show that she engaged in protected activity. Not every generalized complaint to an employer is protected. Charboneau must show that she participated in an proceeding or opposed a violation of

Title VII or the Elliott-Larsen Civil Rights Act. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989). In this case there is no question that Charboneau filed two discrimination charges with the MDCR and that this action constitutes protected activity.

The second element of the prima facie case requires the employer to have knowledge of the protected activity. To satisfy the knowledge requirement, the plaintiff need not show anything more than "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2nd Cir. 2000). There is no question that Miller and the other members of the leadership team were aware of the discrimination charges Plaintiff filed with the MDCR prior to her termination. Charboneau has met the knowledge element of her prima facie case.

The third element of the prima facie case is that the employer consequently took an employment action adverse to plaintiff. "[A] plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation under Title VII." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady v. Liberty National Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). *See also Primes v. Reno* 190 F.3d 765, 767 (6th Cir. 1999) (holding that low performance evaluation is not the type of adverse employment action contemplated by Title VII). On the other hand, termination

13

of employment or demotion evidenced by a decrease in wage or salary would qualify as an adverse employment action. *Hollins*, 188 F.3d at 662 (citation omitted).

In this case Defendant STL was aware that Charboneau had filed discrimination charges with the MDCR and subsequently terminated her employment. There is no question that Plaintiff has met the first three elements of her prima facie case. The only element at issue is the fourth: whether Charboneau has come forward with sufficient evidence to show a causal connection between her protected activity and her termination.

To establish the causal connection under Title VII, "the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott.*, 348 F.3d at 543. *See also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (holding that to show a causal connection under federal law, a plaintiff must produce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action."). Stated differently, to prove a causal connection, a claimant "must produce sufficient evidence from which an inference can be drawn that the [employer] took the adverse employment action because [the claimant] filed a discrimination charge." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

The burden of proof for establishing the causal connection element is articulated differently under the Elliott-Larsen Civil Rights Act. In contrast to an action under Title VII,

14

under Michigan law the plaintiff need not prove that the discharge would not have occurred absent the protected activity. *Polk v. Yellow Freight System, Inc.* 876 F.2d 527, 531 (6th Cir. 1989). Instead, a plaintiff must show that the protected activity was a "significant factor" in the employer's adverse employment action. *Rymal v. Baergen*, 262 Mich. App. 274, 303, 686 N.W.2d 241 (2004) (quoting *Barrett v. Kirtland Community College*, 245 Mich. App. 306, 315, 628 N.W.2d 63 (2001)). "The 'significant factor' standard . . . requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Booker*, 879 F.2d at 1310 (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 199 (6th Cir. 1986)). "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal*, 262 Mich. App. at 303. There must be "a clear nexus" between the adverse action and the protected activity. *Aho v. Dep't of Corrections*, 263 Mich. App. 281, 289, 688 N.W.2d 104, 109 (2004).

"[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Balmer v. HCA, Inc.*, 423 F.3d 606, 615 (6th Cir. 2005) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989)). "Although no one factor is dispositive in establishing a

causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Singfield*, 389 F.3d at 563 (quoting *Nguyen*, 229 F.3d at 563). In *Singfield* the Sixth Circuit held that where the plaintiff was terminated just over three months after he filed a discrimination charge the temporal proximity of the events was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case." *Id.* On the other hand, in *Cooper v. City of North Olmstead*, 795 F.2d 1265 (6th Cir. 1986), the Sixth Circuit held that the mere fact that the plaintiff was discharged four months after filing a discrimination claim was insufficient to support an inference of retaliation. *Id*. at 1272.

In this case Charboneau was terminated more than three years after she first complained about unequal pay, more than a year after she filed her first discrimination charge with the MDCR, and more than four months after she filed her second discrimination charge with the MDCR. This is not a case where the temporal proximity is sudden or close enough in time to support an inference of retaliation.

Charboneau accordingly attempts to show causation by suggesting that after she began reporting discrimination, first internally and then to the MDCR, Defendant responded by escalating its retaliatory actions against her, such as by giving her a less-than-satisfactory performance review, putting her on a PIP, and ultimately by terminating her.

There is no question that Defendant had knowledge of Charboneau's complaints of discrimination before she was terminated. However, Charboneau's argument that there was a causal connection between her protected activity and her termination relies on a specific sequence of events. She contends that the more she reported discrimination, the more Defendant retaliated, and that the retaliatory actions dramatically escalated after she filed her first charge with the MDCR. Notwithstanding Charboneau's argument, the evidence of record does not support her characterization of the events leading up to her termination. Her argument recklessly combines three years of activities together without regard to the specifics of what she reported and when she made those reports. Plaintiff repeatedly misstates the record, overstates the record, or suggests facts that are simply not there.

In her chronological account of activities occurring in May 2002, Charboneau states that she requested an investigation of Miller's discriminatory behavior. (Pl. Br. in Opp. at 10-11). The exhibit she cites in support is her July 2002 email to Ploof. The email does not support a report within the time frame Charboneau attempts to lay out. Neither does it mention the word discrimination.

Charboneau states generally that beginning in December 2001 she consistently reported Miller's discriminatory treatment of her and other employees to Miller, Wheatstone, Ploof and Collins Villemaire. The deposition excerpts Charboneau cites do not support her assertion that she reported discrimination. She admits that she never told Miller that she believed he was discriminating against her because she was a woman. (Charboneau Dep. at

200).   Neither did Miller ever tell her that he had heard that she had accused him of discriminating against her because she was a woman.   (Charboneau Dep. at 201).  Charboneau testified that she asked Human Resources for a reassignment so that she would not have to report to Miller because there was "a trust issue." (Charboneau Dep. at 201).  She felt that the issue "was a backlash of the positions that I took with [Miller]." (Charboneau Dep. at 199).  Charboneau's deposition testimony reveals that she reported her frustration with Miller due to a lack of communication and a lack of support, but the evidence does not support her assertion that she commencing in December 2001 she began a pattern of reporting gender discrimination.  (Charboneau Dep. at 145-53).

The most significant adverse action Charboneau relies on is the less-than-satisfactory performance evaluation she received from Miller in July 2002.   Plaintiff argues that Defendant dramatically escalated its retaliation immediately after she filed her first MDCR charge, and used her filing of the charge as a consideration in deciding to evaluate her.  (Pl. Br. in Opp. at 18).   Contrary to Charboneau's assertions, the evaluation did not follow her filing of the MDCR charge.  Her evaluation was in July 2002 and she did not file her first MDCR charge until August 23, 2002.  Although Charboneau has suggested that she advised Defendant of her intention to go to the MDCR prior to the performance evaluation, she has not presented any evidence of this other than her email in rebuttal to the July 2002 performance evaluation.   Again, the rebuttal email was sent out after the performance evaluation.  Even in that rebuttal email she merely reported that she was contemplating the

direction of legal counsel.  She did not report that she had been to the MDCR.  Moreover, it is significant that in her rebuttal email she accused Miller of repeatedly changing her job description, a lack of consistency, not giving her notice of inadequacies, and not supporting her efforts, but that she did not accuse him of gender discrimination.

Charboneau states that she advised Miller and the senior management team in her July 14, 2002 rebuttal to her performance review that "she wished to have no further communication with Mr. Miller without Human Resources involvement, due to the pending MDCR claim."  (Pl Br. in Opp. at 11).  The rebuttal does contain her recommendation that "any future verbal or written communication between us regarding this review be monitored by a representative form [sic] STL's Human Resource Department."  It does not, however, make any mention of an MDCR claim, and in fact, there was no pending MDCR claim when she wrote this memo.

Although Charboneau was terminated four months after she filed her second MDCR charge, this termination followed many other employment related occurrences including two years of failing to grow sales, six months on probation, three months on a performance improvement plan, and her failure to achieve the sales goal set in her performance improvement plan.  Charboneau's attempt to show a causal connection between her reporting of discrimination and an escalation in retaliatory activities is not supported by the record. The Court concludes that the evidence presented by Charboneau is not sufficient to show that but for her protected activity she would not have been terminated, or that her protected

19

activity was a "significant factor" in her termination. This record simply does not provide sufficient evidence to enable a jury to infer a retaliatory basis for her termination. Because Charboneau has not established a causal connection between the adverse employment action and her protected activity, she has not established a prima facie case of retaliation. Defendant STL is accordingly entitled to summary judgment on her retaliation claim.

**V.**

In an exercise of caution the Court will consider whether Charboneau's case would succeed if she had established her prima facie case of retaliation.

Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the action. *Singfield*, 389 F.3d at 563. To satisfy this burden, the plaintiff "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quoting *Burdine*, 450 U.S. at 257).

STL has submitted evidence that it terminated Charboneau for substandard sales performance. Because STL has articulated a legitimate reason for terminating Charboneau, STL has successfully rebutted any inference of retaliation that was created by the prima facie case.

Once the employer produces sufficient evidence of a nondiscriminatory explanation for its adverse employment action, the plaintiff must show by a preponderance of the

20

evidence that the employer's proffered reason for the employment action is pretextual. *Balmer*, 423 F.3d at 614 (citing *Morris*, 201 F.3d at 793). To do so a plaintiff must show that the employer's proffered explanation is "unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), or that the employer did not "'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Balmer*, 423 F.3d at 614 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). A plaintiff can demonstrate pretext by showing that the proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Singfield*, 389 F.3d at 564 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Charboneau contends that Defendant's articulated reason for her discharge is not credible because she had never been given a sales goal until she started complaining of discrimination. Charboneau does not contend that she was singled out for this treatment, or that no other employees were ever given sales goals when they fell behind in their sales performance.

Charboneau does not deny that she was expected to grow accounts even if she had not been given specific goals. In an email dated September 16, 2001, Miller advised Charboneau that she would be entitled to a 25% bonus based on her efforts "to build the company's

21

national accounts program aggregate revenues." In that email he acknowledged that the goal was vague, but he was reluctant to place a growth number on these accounts:

> I think long term we should reasonably look to double the aggregate size of these accounts. At the end of the fiscal year, I would like to document the progress we've made on SNAPL accounts. Revenue growth is paramount to this bonus plan.

(Miller 9/16/01 email, Pl. Ex. 21).

Charboneau does not deny that she failed to grow the accounts that were assigned to her. The unrebutted evidence is that there was an overall decrease in sales to her SNAPL accounts from July 2001 through June 2002, and that for fiscal year ending March 31, 2003 her total revenue was significantly less than the previous 12 month period. (Miller Decl. ¶¶ 28 & 42). Although Charboneau prepared her own matrix showing account growth as of June 2002, she did not present any evidence to suggest that it was improper for Defendant to measure sales growth by relying on audited sales records rather than on a salesperson's individual computation of sales generated.

The evidence reflects that many others who did not engage in protected activity also received adverse employment actions. In December 2001 five employees in the sales and marketing group were laid off for low productivity (Miller Decl. ¶¶ 20-21), and between May and October 2002 four other employees were demoted or placed on PIPs due to poor sales performance. (Miller Decl. ¶¶ 26, 36-39).

22

Finally, Charboneau does not deny that she missed her $350,000 sales revenue goal by $168,000, and she has not presented any evidence to suggest that the sales goal assigned to her in her PIP was not reasonable or that it was designed to make her fail.

Even if Charboneau had produced sufficient evidence to establish a causal connection for purposes of the prima facie case, the Court would nevertheless enter summary judgment in favor of STL because STL has articulated a legitimate non-retaliatory explanation for her termination and Charboneau has not presented sufficient evidence to suggest that the articulated reason was pretextual. Charboneau has not produced sufficient evidence from which the jury could reasonably reject STL's explanation for terminating her. Accordingly, for this reason as well, Defendant STL is entitled to summary judgment on Charboneau's claim of retaliation.

In view of this resolution of Defendants' motion for summary judgment, Defendant's motion in limine will be denied as moot.

An order and judgment consistent with this opinion will be entered.

Date:   December 1, 2005         /s/ Robert Holmes Bell
                                 ROBERT HOLMES BELL
                                 CHIEF UNITED STATES DISTRICT JUDGE